FILED

2021 Aug-16  AM 10:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| RODNEY BUSHA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  4:20-cv-00149-HNJ |
| | ) | |
| ANDREW SAUL, | ) | |
| COMMISSIONER, SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Rodney Busha seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability and disability insurance benefits.  The court has carefully considered the record, and for the reasons stated below, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00-114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's

2

impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii), 404.1525, 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant can perform other work, the

3

evaluator will not find the claimant disabled. *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(g), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Mr. Busha, age 49 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on December 15, 2016, alleging disability as of February 3, 2016. (Tr. 131–33). The Commissioner denied his claims, and Busha timely filed a request for hearing on March 13, 2017. (Tr. 49, 61–65, 67–68). An Administrative Law Judge ("ALJ") held a hearing on December 20, 2018. (Tr. 28–47). The ALJ issued an opinion on January 10, 2019, denying Busha's claim. (Tr. 14–24).

Applying the five-step sequential process, the ALJ found at step one that Busha did not engage in substantial gainful activity after February 3, 2016, his alleged disability onset date. (Tr. 19). At step two, the ALJ found Busha bore the severe impairments of bilateral knee osteoarthritis, status post bilateral ACL reconstructions, and right knee revision ACL reconstruction. (*Id.*) At step three, the ALJ found that Busha's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20).

Next, the ALJ found that Busha exhibited the residual functional capacity ("RFC") to perform light work, except he could only occasionally climb ramps or stairs, and he could never climb ladders, ropes, or scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. In addition, Busha could not sustain concentrated exposure to vibrations; unprotected heights; and dangerous, moving machinery.

5

Finally, he must alternate sitting and standing every twenty to thirty minutes throughout the workday to effect a brief postural change without leaving the workstation. (*Id.*)

At step four, the ALJ determined Busha did not retain the ability to perform his past relevant work as a stores laborer. (Tr. 23). At step five, the ALJ determined that, considering Busha's age, education, work experience, and RFC, a significant number of other jobs exist in the national economy that he could perform. (*Id.*) Accordingly, the ALJ determined that Busha has not suffered a disability, as defined by the Social Security Act, since February 3, 2016. (Tr. 24).

Busha timely requested review of the ALJ's decision. (Tr. 130). On December 2, 2019, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1–3). On February 2, 2020, Busha filed his complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

Busha contends the ALJ's decision does not rest upon substantial evidence because the ALJ improperly discredited his subjective complaints of pain, and, in turn, misapplied the pain standard.[2] Contrary to Busha's contention, however, the court

---

[2] Busha's brief lacks an explicit articulation of the issue he raises vis-à-vis the ALJ's decision. However, Busha discusses the rules pertinent to an ALJ's assessment of the claimant's pain allegations, and he highlights evidence relevant to his knee pain and contends his "knee impairments could reasonably be expected to provide his alleged symptoms." (Doc. 16 at 20). The Commissioner construed Busha's argument as challenging solely the ALJ's pain assessment, and Busha does not contest the Commissioner's framing of the pertinent issue. Based upon the parties' briefing, therefore, the court will assess only the issue whether substantial evidence supports the ALJ's assessment of Busha's pain allegations.

finds substantial evidence demonstrates the ALJ properly applied the pain standard and relied upon objective medical evidence to discredit his allegations of pain.

> To establish disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." 2016 WL 1119020 at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Busha testified during the administrative hearing that he resigned his previous job due to pain in his knees and an associated knee surgery. (Tr. 34, 41). Busha had received three knee surgeries at the time of the hearing, and continued to experience constant pain in both knees.[3] (Tr. 34–35). A bilateral knee replacement represented Busha's "next option." (Tr. 35). He scored his pain level at 5 to 6/10 while sitting, and 7 to 8/10 while walking. (*Id.*) He could stand for roughly fifteen minutes at one time; he could sit for roughly thirty minutes at one time; he could not "walk a city block without problems"; and he experienced numbness in his feet and constant knee pain while sitting. (Tr. 36). Busha estimated he spends eighty-five to ninety percent of an eight-hour workday supine. (Tr. 37).

Busha could not squat, stoop, bend, or climb ladders, and he could not climb

---

[3] Busha underwent bilateral anterior cruciate ligament ("ACL") reconstruction in early 2006. (Tr. 204, 210). The anterior cruciate ligament constitutes "a major ligament" in the knee connecting the thighbone to the shinbone, and an ACL reconstruction surgery entails replacing a torn ACL with tissue. https://www.mayoclinic.org/tests-procedures/acl-reconstruction/about/pac-20384598 (last visited August 10, 2021). As elaborated more fully below, Busha underwent an operation on his right knee in 2016.

stairs "very well." (Tr. 37).  He could dress and "do small things like that." (*Id.*)  Knee

pain sometimes awoke Busha during the night.  (Tr. 38).  At the time of the hearing,

Busha was not receiving medical treatment for his knee pain due to a lack of insurance.[4]

(Tr. 34–35).  Prior physicians prescribed him opioid pain medication, which caused

negative side effects. (Tr. 38).  Busha could not perform household chores or yardwork,

and his family performed such tasks. (Tr. 39).  He lacked the capacity to "walk up and

down the aisles" of a Wal-Mart. (Tr. 40).  Busha's pain remained "always on his mind,"

making it difficult to stay on task.  (Tr. 40–41).  Busha enjoyed good health and

"always . . . worked" prior to the onset of his knee pain.  (Tr. 38–39).

In his Function Report, Busha stated he "stay[ed] off [his] feet as much as

possible" when not performing household chores. (Tr. 161).  He fed and watered his

pets, and fed his mother every third weekend. (Tr. 162).  Busha indicated his pain did

not affect his ability to prepare meals or maintain his personal care, though he

experienced difficulty lowering and raising himself from the toilet. (Tr. 162–63).  He

shopped, performed yardwork, disposed of garbage, and prepared meals weekly.  (Tr.

163–64).  He spent time outside "most every day," except when his knees hurt too

badly. (Tr. 164).  Busha could drive, pay bills, count change, handle a savings account,

and use checks or money orders.  (*Id.*)  Busha indicated his hobbies consisted of

---

[4] Busha stated his employment-based health insurance plan terminated when he resigned his previous job. (Tr. 34).  He obtained short-term and long-term disability benefits through his previous employer; however, the insurance company reduced his long-term disability benefits award when he applied for Social Security disability benefits. (Tr. 41–42).

hunting, which he undertook on Saturdays "when [he] [could]." (Tr. 165). He could not hunt "very well," as his pain diminished his ability to maneuver. (*Id.*) He conversed with others daily, attended church every Sunday, and shopped at a dollar store three to four times weekly. (*Id.*)

Further, Busha reported his pain affected his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and complete tasks. (Tr. 166). Busha indicated he could pay attention for "as long as needed," and follow written and oral instructions "fairly well." (*Id.*) Busha stated his knee pain engendered a fear of heights. (Tr. 167). He reported he wore a knee brace when "on [his] feet or walking for a period of time." (*Id.*) Busha indicated a physician prescribed him the knee brace after a surgery. (*Id.*)

In his opinion, the ALJ summarized Busha's hearing testimony and Function Report regarding his pain. (Tr. 21). The ALJ satisfied the Eleventh Circuit pain standard by stating that Busha's medically determinable impairments could reasonably be expected to produce some of the symptoms he alleged, but Busha's statements concerning the intensity, persistence, and limiting effects of his symptoms did not accord with the medical evidence of record and other evidence. (*Id.*) The ALJ detailed Busha's medical evidence to support his decision, highlighting records indicating that Busha ambulated without an assistive device, and exhibited normal motor strength and no muscle atrophy in his lower extremities. (Tr. 21–23). The ALJ adequately articulated his findings and supported them with substantial evidence.

On January 31, 2016, Busha's right knee gave out when he raised from a squatting

position.  The record depicts Busha sought treatment for his knee pain during the period 2016 to 2017.  Busha's medical evidence principally comprises 2016 imaging and surgical records, treatment records from Dr. Eric Janssen pertaining to the period February 2016 to June 2017, and physical therapy records from the period March to May 2016.

Busha underwent imaging of his right knee on February 10, 2016, which revealed irregularities "suggestive of a complex posterior horn medial meniscal tear." (Tr. 232).  Busha's knee also exhibited "[f]ull-thickness degenerative articular cartilage loss" with associated swelling.  (*Id.*)  On February 12, 2016, Busha presented at an appointment with Dr. Joseph C. Kendra complaining of popping and swelling in his right knee.  (Tr. 204).  Upon examination, Busha exhibited tenderness and instability in his right knee, and no abnormalities in his left knee.  (Tr. 205).  Dr. Kendra interpreted Busha's February 10, 2016, imaging as depicting a "recurrent ACL tear" in addition to a medial meniscal tear.  (*Id.*)  Dr. Kendra indicated he would refer Busha to an orthopedic surgeon for "revision" of his ACL.  (*Id.*)  The record does not contain any further treatment records from Dr. Kendra.

The record depicts Busha established care with Dr. Janssen on February 23, 2016, based upon Dr. Kendra's referral.  (Tr. 210).  Dr. Janssen recommended that Busha receive an "ACL reconstruction/revision" of his right knee.  (Tr. 211).  Busha underwent the procedure on March 8, 2016.  (Tr. 315–17).

Busha attended multiple physical therapy sessions per week during the period

March to May 2016, where he consistently reported only mild or moderate pain levels. The records portray Busha attended eleven sessions in March 2016. (Tr. 234–54). Busha scored his pain levels at 5 and 6/10 during the first four sessions, (tr. 234, 236, 238, 240); however, his reported pain levels decreased from 4/10 to 2/10 during the next six sessions. (Tr. 242, 244, 246, 248, 250, 252). Busha scored his pain level at 4/10 at his final March 2016 session; nevertheless, he "cont[inued] to advance well" and "tolerated [a] new modality to help improve pain in [his] posterior/medial knee." (Tr. 254). At his March 2016 follow-up appointment with Dr. Janssen, Busha reported "mild swelling," but he was "doing very well" otherwise and controlling his pain without medication.[5] (Tr. 334).

Busha attended twelve physical therapy sessions in April 2016, where his reported pain levels initially increased from 3/10 to 5/10 during the first three sessions, (tr. 256, 258, 260), but decreased to 0/10 by the fourth session. (Tr. 262). Busha scored his pain level at 3/10 at his fifth and sixth sessions, (tr. 264, 266), though he scored his pain level at 2/10 at his seventh, eighth, ninth, tenth, and eleventh sessions. (Tr. 268, 270, 272, 274, 276). Busha scored his pain level at 4/10 at his final April 2016 session; notably, however, he attributed his increased soreness and pain to tilling his garden. (Tr. 278). At his April 2016 follow-up appointment with Dr. Janssen, Busha reported he was "doing pretty well," and he presented "no real specific complaints" apart from

---

[5] At the appointment, Dr. Janssen issued a note indicating Busha should not return to work before his next April 2016 follow-up appointment. (Doc. 213).

discomfort in his knee "as he works out." (Tr. 217). Upon examination, Busha exhibited full extension and "almost full" flexion. (Tr. 218). Further, he displayed "excellent stability" and "[m]inimal swelling around the knee."[6] (*Id.*)

Busha attended eleven physical therapy sessions in May 2016. He scored his pain level at 4/10 at his first session, which he again attributed to tilling his garden. (Tr. 280). Busha scored his pain level at 2/10 at the next three sessions, (tr. 282, 284, 286), and 3/10 at the fifth session. (Tr. 288). He scored his pain level at 5/10 at the sixth session, reporting that based upon a newly introduced exercise, "he was in so much pain after [the] last [session] he almost went to the [emergency room]." (Tr. 290). However, despite his increased pain, Busha exhibited a normal range of motion. (*Id.*) Further, Busha scored his pain level at 3/10 at his final five sessions, (tr. 292, 294, 296, 298, 300), and he "continue[d] to demonstrate [a] full [range of motion]." (Tr. 294). Likewise, he "cont[inued] to improve with quad[raceps] and hamstring strength," despite "tenderness in [his] posterior knee." (Tr. 296).

At his May 2016 follow-up appointment with Dr. Janssen, Busha reported he experienced soreness only upon performing a full extension or applying weight on his knee. (Tr. 224). Upon examination, Busha exhibited "excellent" range of motion and stability, and his right knee displayed no effusion. Further, he displayed "strong" quadriceps and manifested "[n]o other significant findings." (Tr. 225). Dr. Janssen

---

[6] At Busha's April 2016 appointment, Dr. Janssen extended his no-work restriction until May 2016. (Tr. 214).

prescribed Busha anti-inflammatory medications and encouraged him to exercise.  (*Id.*)

Busha returned to Dr. Janssen in July 2016, where he reported experiencing "pretty significant discomfort" upon attempting a full knee extension and a "locking" sensation upon waking.  (Tr. 221).  Busha conveyed he did not "trust" his knee.  (*Id.*) Busha manifested diminished quadriceps strength upon examination, though he did not display any effusion.  (Tr. 222).  Dr. Janssen recommended Busha undergo imaging of his knee and receive an injection for pain.[7]  (*Id.*)

Busha underwent imaging of his knee on August 1, 2016, which revealed "[s]evere degenerative changes in the medial joint compartment with marked thinning of the articular cartilage."  (Tr. 302).  Further, Busha's medial meniscus portrayed as "severely truncated," and he exhibited swelling in his medial tibial plateau.  (*Id.*)

During an August 5, 2016, follow-up appointment, Dr. Janssen noted Busha's right knee presented "quite a complex problem."  (Tr. 305).  Dr. Janssen further noted that although Busha's knee manifested "a little bit more mobility," based upon the August 1, 2016, imaging, it nevertheless exhibited "substantial arthritic changes" and "substantial varus."[8]  (*Id.*)  Upon examination, Busha manifested tenderness in his knee but displayed little effusion.  (Tr. 306).  Dr. Janssen "tried to talk [Busha] into" wearing

---

[7] Dr. Janssen further noted Busha should remain "off work until released."  (Tr. 220).

[8] "Varus knee" manifests when the tibia "turns inward instead of aligning with [the] femur," causing "[the] knees to turn outward."  https://www.healthline.com/health/varus-knee (last visited August 10, 2021).

a "medial unloader brace," but Busha expressed no desire to do so.  Dr. Janssen "did at least talk [Busha] into using his ACL brace" when walking.  (*Id.*)  Dr. Janssen and Busha discussed various additional treatment options, including an injection, an osteotomy, a total knee replacement, and "putting [Busha] on disability."  (*Id.*)

Busha presented at a follow-up appointment with Dr. Janssen on August 17, 2016, to receive an injection in his knee.  (Tr. 322).  Busha displayed no effusion in his knee, and he exhibited a good range of motion.  (Tr. 323).  Dr. Janssen advised Busha to exercise and wear knee braces.[9]

During his September 2016, follow-up appointment with Dr. Janssen, Busha reported the injection helped his knee "some."  (Tr. 320).  Upon examination, Busha's knee exhibited tenderness and mild instability.  (Tr. 321).  However, Busha did not display any effusion, and he manifested average quadriceps strength and good mobility.  (*Id.*)  Dr. Janssen noted Busha's treatment options included wearing his knee brace or receiving a knee replacement.[10]  Busha indicated he did not wish to undergo a knee replacement.  (*Id.*)

Busha returned for a follow-up appointment with Dr. Janssen in November 2016, where he reported he was "really struggling" with his right knee pain.  (Tr. 318).

---

[9] Dr. Janssen also noted Busha could not return to work before his next September 2016 follow-up appointment.  (Tr. 304).

[10] In addition, Dr. Janssen indicated he would reevaluate Busha's ability to return to work in six weeks. (Doc. 311).

Upon examination, Busha exhibited tenderness, crepitation, and tightness in his flexion. (Tr. 319). Busha also displayed poor quadriceps strength in his left extremity. (*Id.*) Dr. Janssen prescribed Busha an opioid pain medication and again discussed the option of a total knee replacement. (*Id.*)

Busha presented at an appointment with Dr. Janssen in June 2017 complaining of "significant" discomfort in his knees. (Tr. 354). Busha elaborated he reinjured his left knee, which caused him pain. (*Id.*) Upon examination, Busha's left knee portrayed as "very unstable" and exhibited "a lot of varus." (Tr. 355). Nevertheless, Busha displayed good mobility and no effusion in both his right and left knees. He manifested "increased anterior excursion" in his right knee, though it presented as more stable than his left knee. (*Id.*) Dr. Janssen advised Busha that a bilateral knee replacement represented "his final solution to address both instability and arthritis." (*Id.*) Busha indicated he desired to forgo such operation for "as long as he [could]." (*Id.*) The record does not depict Busha received a bilateral knee replacement or sought further treatment with Dr. Janssen.

Based upon the foregoing review, the record contains substantial evidence buttressing the ALJ's evaluation of Busha's testimony regarding his pain. As discussed previously, Busha's physical therapy records depict he consistently reported only mild or moderate pain levels, which improved during the course of his sessions. Similarly, Dr. Janssen's records portray that Busha frequently exhibited a normal range of motion, good mobility, and no effusion in his knees.

The ALJ also properly evaluated Dr. Anand S. Iyer's February 2017 consultative examination. Busha complained of bilateral knee pain during the examination, and indicated he wore a metal knee brace only when walking long distances, walking up hills, or climbing steps. (Tr. 350). Busha stated he wore a soft, non-prescription knee brace when walking "part of the time" and when performing daily activities. (*Id.*) In addition, Busha reported walking, climbing steps, bending, lifting, and prolonged sitting or standing exacerbated his knee pain. (*Id.*)

Upon examination, Busha displayed difficulty raising and lowering himself from the exam table, and he ambulated with a limp favoring his left leg. (Tr. 351). He could not squat, or walk on his heels or tiptoes due to pain. (*Id.*) He also exhibited a reduced range of motion in his bilateral knees. (*Id.*) Nevertheless, Busha ambulated the distance of the exam room, which measured less than ten feet, without his knee brace. (*Id.*) Further, he manifested normal motor strength and displayed no muscle atrophy. (*Id.*) He exhibited no other abnormalities. (*Id.*) Dr. Iyer opined that Busha "may have some impairment of functions involving: standing, walking, climbing steps, bending, lifting, twisting, squatting, and carrying." (*Id.*) However, Dr. Iyer determined Busha did not exhibit "significant limitations" vis-à-vis his ability to sit, reach overhead, handle, hear, or speak. (*Id.*) Dr. Iyer indicated Busha may require a brace for his right knee "part of the time." (*Id.*)

The ALJ accorded Dr. Iyer's opinion significant weight, as the limitations he prescribed accorded with Dr. Iyer's examination of Busha's bilateral knees and Dr.

Janssen's similar examination findings. (Tr. 22). However, the ALJ determined Busha reasonably required a sit/stand option based upon his knee pain, and thus concluded Dr. Iyer's opinion vis-à-vis Busha's unlimited ability to sit did not comport with the evidence of record. (*Id.*) Therefore, ALJ accounted for Dr. Iyer's opinion in his residual functional capacity assessment to the extent it accorded with his own conclusions vis-à-vis Busha's limitations. The ALJ properly assessed Dr. Iyer's opinion pursuant to the pertinent Regulations, which provide the ALJ may adjudge the consistency of the physician's opinion with "the record as a whole." 20 C.F.R. § 404.1527(c)(4). Dr. Iyer's opinion thus constitutes substantial evidence supporting the ALJ's residual functional capacity determination.

Further, the ALJ properly evaluated Dr. Gloria L. Sellman's March 2017 Residual Functional Capacity Assessment. (Tr. 55–59). Dr. Sellman opined that Busha retained the residual functional capacity for light work; however, he could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs. (Tr. 56). Further, he could never climb ladders, ropes, or scaffolds; he should avoid concentrated exposure to extreme cold, wetness, and vibration; and he should avoid all exposure to hazards and unprotected heights. (Tr. 56–57). In addition, he could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds. (Tr. 56). He could also stand, sit, and walk for six hours of an eight-hour workday. (*Id.*) Further, he could only occasionally push and pull with his right leg. (*Id.*)

The ALJ assigned Dr. Sellman's opinion significant weight, as he concluded "the

postural and environmental limitations [were] well-tailored to [Busha's] bilateral knee examination findings." (Tr. 23). The ALJ likewise noted the postural and environmental limitations embraced "factors which may exacerbate [Busha's] knee pain." (*Id.*) However, the ALJ determined that based upon the evidence depicting Busha's normal motor strength and lack of muscle atrophy, he did not sustain any limitations regarding his ability to push and pull with his lower extremities. (*Id.*) Further, the ALJ concluded Busha required a sit/stand option to relieve discomfort in his knees. (*Id.*) Accordingly, the ALJ accounted for Dr. Sellman's opinion in his residual functional capacity assessment to the extent it accorded with his own conclusions vis-à-vis Busha's limitations. Therefore, Dr. Sellman's opinion constitutes substantial evidence supporting the ALJ's residual functional capacity determination.

In short, the ALJ offered adequate explanations for discounting Busha's testimony as to his pain. Further, the ALJ properly cited objective medical evidence refuting the severity of the alleged symptoms, and Busha has not offered any argument or pointed to any facts undermining the substantial evidence supporting the ALJ's residual functional capacity assessment. Although Busha maintains his pain limits him to a greater degree than the ALJ assessed, the court cannot reweigh the evidence or second-guess the ALJ's conclusions. *See Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). Thus, the ALJ did not err in assessing Busha's credibility.

Busha contends "a treating physician's opinion that the claimant requires knee replacement surgery usually resolves the question of chronic disabling knee pain in

favor of the claimant." (Doc. 16 at 15).  Busha thus reasons that if the claimant's treating physician recommends knee replacement surgery, the ALJ may only deny disability benefits if substantial evidence demonstrates "the claimant does not in fact need that knee replacement surgery." (*Id.*)  According to Busha, therefore, Dr. Janssen's recommendation that he receive a bilateral knee replacement itself constitutes substantial evidence that he sustains a disability.   However, as the Commissioner properly highlights, Busha fails to cite any authority for his proposition that a treating physician's recommended treatment (including a bilateral knee replacement) stands dispositive of disability, nor does the court discern the existence of the same.[11]  *See Turakulov v. Saul*, No. 4:18-cv-10176-JB, 2020 U.S. Dist. LEXIS 108810, at *30 (S.D. Fla. Mar. 31, 2020) ("[The treating physician's] opinion that Plaintiff needed a knee replacement does not mean that Plaintiff could not perform the reduced range of light work . . . assessed by the ALJ.").

To the contrary, as elaborated previously, an ALJ properly weighs various factors

---

[11] Busha emphasizes it "is undisputed that [he] requires double knee replacement surgery," (doc. 16 at 14), and urges the court to distinguish his case from the circumstances depicted in *Freeman v. Barnhart*, 220 F. App'x 957 (11th Cir. 2007).  Busha's entreaty does not withstand review.  In *Freeman*, the Court ruled the ALJ properly discounted the treating physician's opinion that the claimant "should have a total knee replacement" because the opinion did not accord with the treating physician's own treatment records.  *Freeman*, 220 F. App'x at 961.  Here, by contrast, the ALJ did not discount Dr. Janssen's recommendation that Busha receive a bilateral knee replacement or otherwise express an opinion as to Busha's need for the surgery.  Rather, as elaborated previously, the ALJ determined that notwithstanding Dr. Janssen's recommendation, Busha's largely normal objective findings undermined his complaints of disabling knee pain.  Accordingly, the Court's reasoning in *Freeman* stands inapposite to the instant assessment.

Further, although the ALJ assigned "diminished weight" to Dr. Janssen's no-work restrictions, Busha does not challenge the ALJ's assessment and the court thus will not assess the same.  (Tr. 22).

to assess the existence of a disability based upon subjective complaints of pain, including the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms.   *See* 20 C.F.R. §§ 404.1529(c)(3), (4).  Although a claimant's recommended treatment regimen may bear relevance to the credibility assessment, *see* SSR 16-3p (the ALJ may consider ("[t]reatment, other than medication, an individual receives or has received for relief of pain" in assessing pain allegations), no authority indicates it "resolves" the pain assessment in the claimant's favor.  (Doc. 16 at 15).  Thus, the evidence regarding Dr. Janssen's recommendation for a bilateral knee replacement does not demonstrate Busha sustains disabling knee pain, and the ALJ bore no duty to invoke substantial evidence undermining Dr. Janssen's recommendation.  As discussed herein, substantial evidence buttresses the ALJ's adverse pain determination, Dr. Janssen's recommendation notwithstanding.

Furthermore, the ALJ properly heeded Dr. Janssen's surgery recommendations. The ALJ noted "Dr. Janssen suggested [a] total knee replacement as early as August 5, 2016, and on . . . June 4, 2017[,] stated that [a] bilateral knee replacement was the ultimate solution to address both [Busha's] instability and arthritis."  (Tr. 21) (internal citations omitted).   Despite Dr. Janssen's recommendations, however, the ALJ determined "[Busha's] own statements and his findings on examination belie the degree

of limitation he alleges." (*Id.*)   The ALJ observed that notwithstanding Dr. Janssen's recommendations, Busha "repeatedly stated he wished to think about [undergoing surgery] before proceeding." (*Id.*)   The ALJ similarly noted Busha's reluctance to wear the knee brace Dr. Janssen prescribed, as Dr. Janssen attempted to "talk [Busha] into using a medial unloader brace," but only "talked [Busha] into using his ACL brace." (*Id.*)   The ALJ properly considered Busha's disinclination to undergo surgery and wear his prescribed knee brace as factors in assessing his allegations of disabling pain.   *See Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 777 (11th Cir. 2016) ("Lack of a desire for treatment is not good cause for failure to seek treatment."); *Jarrell v. Comm'r of Soc. Sec.*, 433 F. App'x 812, 814 (11th Cir. 2011) (the ALJ properly considered the claimant's conservative pain treatment and four-month lapse in medical treatment in assessing her pain allegations); *Alarid v. Colvin*, 590 F. App'x 789, 794 (10th Cir. 2014) (ALJ did not err when determining claimant's symptoms may not have been as serious as he alleged because he had not yet obtained required dental clearance nine months after he had been recommended for knee replacement surgery); *Johnson v. Saul*, No. 5:18cv256/EMT, 2020 U.S. Dist. LEXIS 35411, at *19–20 (N.D. Fla. Mar. 2, 2020) (the ALJ properly considered the claimant's resistance to treatment as a factor in assessing her pain allegations); *Robinson v. Colvin*, No. 3:14-cv-504-J-34JRK, 2015 U.S. Dist. LEXIS 91245, at *14 (M.D. Fla. June 11, 2015) (although the claimant did not undergo an additional back surgery that her treating orthopedist recommended, given her pain management regimen, the ALJ nevertheless properly discredited her subjective

complaints of pain and determined she could perform light work).

Busha contends his "reluctance to quickly [pursue a bilateral knee replacement] is not uncommon."   (Doc. 16 at 16).   However, the issue whether Busha's renouncement of surgery represents a common decision bears no relevance to the inquiry at bar.  Even accepting Busha's contention that candidates for a bilateral knee replacement often defer the operation, the ALJ nevertheless appropriately considered Busha's reluctance as a factor undermining his complaints of disabling knee pain.  As elaborated previously, Dr. Janssen's recommendation does not establish that Busha sustains disabling knee pain, and Busha's forsaking of the operation properly bears upon the ALJ's assessment of his pain allegations.

Finally, Busha suggests the ALJ improperly considered his inability to afford the bilateral knee replacement in assessing his pain allegations.  *See* Doc. 16 at 16 ("[T]he fact that [Busha] has waited beyond the time that he still had health insurance to want to [receive the surgery] should not preclude his claim.").  When a claimant cannot afford medical treatment, an ALJ should not draw a negative inference from the claimant's failure to seek additional treatment.  *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir. 1998); *see also Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) ("[P]overty excuses [a claimant's] noncompliance" with medical treatment.).  Thus, "[w]hen the ALJ 'primarily if not exclusively' relies on a claimant's failure to seek treatment, but does not consider any good cause explanation for this failure, [the court should] remand for further consideration." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1268 (11th Cir. 2015) (citing *Ellison v. Barnhart*,

355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam); *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 487 (11th Cir. 2012) (per curiam)).  "However, if the ALJ's determination is also based on other factors, such as RFC, age, educational background, work experience, or ability to work despite the alleged disability, then no reversible error exists."  *Henry*, 802 F.3d at 1268 (citing *Ellison*, 355 F.3d at 1275).

The ALJ did not draw an impermissible negative inference based upon Busha's inability to afford the bilateral knee replacement.  The pertinent portion of the ALJ's opinion reads:  "Though Dr. Janssen repeatedly advised knee replacement when [Busha] still had the financial means to follow up with him, [Busha] repeatedly stated he wished to think about it before proceeding."[12]  (Tr. 21).  The ALJ thus did not draw a negative inference from Busha's failure to receive the knee replacement when he could not afford the surgery, but rather determined Busha's failure to do so when he "s*till had the financial means*" undercut his allegations of disabling knee pain.  (*Id.*) (emphasis added).  Accordingly, the ALJ did not improperly disregard Busha's inability to afford the surgery when considering his decision to defer the same.

Furthermore, even assuming the ALJ failed to properly consider Busha's inability to afford the surgery, any such error would not warrant remand.  After noting Busha's reluctance to receive the surgery, the ALJ proceeded to detail Busha's medical evidence depicting his normal motor strength, lack of muscle atrophy and knee effusion, ability

---

[12] To recount, Busha testified his employment-based health insurance plan terminated when he resigned his previous job, and the insurance company reduced his long-term disability benefits award when he applied for Social Security disability benefits. (Tr. 34, 41–42).

to ambulate without an assistive device, and largely normal mobility in his knees. (Tr. 21–22). The ALJ's assessment of this evidence demonstrates that the RFC formulation did not derive solely from Busha's failure to receive the surgery; it also emanated from substantial evidence undermining the alleged severity of Busha's knee pain and the scope of his limitations. Moreover, the ALJ ultimately found Busha not disabled because a significant number of jobs existed in the national economy that comported with his RFC. (Tr. 23–24). For the foregoing reasons, the ALJ's assessment of Dr. Janssen's surgery recommendation and Busha's nonacceptance thereof does not manifest as improper. *See Green v. Soc. Sec. Admin., Comm'r*, 695 F. App'x 516, 522 (11th Cir. 2017) ("[E]ven if we agreed with [the claimant] that the ALJ drew an adverse inference from the fact that she had not sought specialized treatment for her fibromyalgia or back pain, [she] cannot show reversible error . . . [g]iven that the ALJ did not rely exclusively on [her] failure to seek specialized treatment when discrediting her testimony."); *Ybarra v. Comm'r of Soc. Sec.*, 658 F. App'x 538, 541 n.2 (11th Cir. 2016) (the ALJ improperly relied upon the claimant's deferral of treatment without considering his inability to afford the same; however, the ALJ's error did not warrant reversal because the ALJ buttressed the credibility assessment with other substantial evidence). In summary, Busha fails to establish substantial evidence does not support the ALJ's decision.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

**DONE** this 16th day of August, 2021.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE